# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

_____

| | | |
|---|---|---|
| KEITH E. DOYLE, | ) | Cause No. CV 09-58-BU-RFC-CSO |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATION OF |
| CAPTAIN DAN O'FALLON, | ) | U.S. MAGISTRATE JUDGE |
| Great Falls Regional Prison; | ) | (Claims 1-4) |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF MONTANA, | ) | |
| | ) | |
| Respondents. | ) | |

_____

On July 15, 2009, Petitioner Keith Doyle filed this action for writ of habeas corpus under 28 U.S.C. § 2254. Doyle is a state prisoner proceeding pro se. He was convicted of deliberate homicide in Montana's Second Judicial District Court, Butte-Silver Bow County, on an accountability theory in connection with the beating death of Richard Solwick. His federal petition contains five claims. This document addresses only Claims 1-4.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 1

On October 9, 2009, Respondents were ordered to file an Answer to Claims 1-4.  Respondents ("the State") complied on November 19, 2009.  Doyle was permitted to file a Reply, Order to State to File Answer (doc. 6) at 5-6 ¶ 5, but he declined to do so.

I. <u>Background</u>

In late February or early March, 2003, Doyle and his girlfriend, Katerina Bowen, lived in a first-floor apartment on West Broadway in Butte.  Solwick lived in the apartment above theirs.  Ex. D15 at 23:24-24:10 (Bowen); Ex. D24 at 12:10-22 (Doyle).[1]  Solwick "drank and everybody knew he drank 24-7."  Ex. D15 at 41:22 (Bowen).  Doyle described himself as "drunk the majority of the time."  Doyle and Solwick frequently drank together.  One night, they were at the Corner Bar on Montana Avenue when Dean Maestas came in.  Solwick told Doyle he did not like Maestas, and Doyle told Solwick that Maestas could not be trusted.  Solwick and Doyle left.  Ex. D24 at 13:1-15:6, Ex. D25 at 4:24-8:11 (Doyle).

---

[1]  All exhibits cited in this document are attached to the State's Answer (doc. 13).  Ex. D is the trial transcript.  Page references show the CM-ECF page number and line numbers.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE (CLAIMS 1-4) / PAGE 2

On the night of March 3, 2003, Doyle was not at the Corner Bar, but Maestas, Cheren Day, and Solwick were. Solwick was buying drinks with a wad of $20 bills. Ex. D18 at 31:11-32:19, 34:23-35:12 (Spencer); Ex. D23 at 9:3-19 (Dodd).[2] Day was running errands for various people but stopped in for a drink or two from time to time. After Solwick fell off his barstool for a second time, the bartender insisted he leave. Day gave him a ride home. Doyle was there, already drunk. When Day left Solwick's apartment, Doyle and Solwick were in Solwick's apartment together, drinking. E.g., Ex. D10 at 9:1-19:6 (Maestas); Ex. D15 at 26:4-30:9 (Bowen); Ex. D19 at 7:7-13:4 (Day); Ex. D23 at 6:18-14:20 (Dodd); Ex. D24 at 18:21-20:19 (Doyle).

Day went back to the Corner Bar. She appeared to have Solwick's wad of cash. Ex. D23 at 14:1-17:2 (Dodd). She told Maestas that Doyle was at Solwick's apartment. Bar patrons testified that Maestas was angry and looking for a fight. Ex. D18 at 33:3-19 (Spencer); Ex. D24 at 2:23-3:21 (Hendrickson). He told Day he had a bone to pick with Doyle

---

[2] Solwick was recorded on a surveillance camera at his bank on the morning of March 3. Police were told he withdrew $260 in cash. Ex. D20 at 44:20-45:15 (Harrington).

because Solwick told him that Doyle called him a "punk" who could not be trusted.  Day drove Maestas to Solwick's apartment.  Ex. D10 at 19:19-21:13 (Maestas); Ex. D19 at 13:5-15:5 (Day).

Maestas and Day entered the apartment and Maestas attacked Doyle, who wrestled him to a draw.  Doyle insisted he did not call Maestas a punk.  Maestas then went for Solwick.  Doyle, Maestas, and Day agree up to this point, but no further.

Doyle testified that Maestas "sucker punched" Solwick twice in the face.  Doyle said he "didn't want to be anybody's punching bag, and he didn't want to sit back while Richard was assaulted," so he left.  Ex. D21 at 51:10-12 (McCarthy).  At that time, Solwick had a slightly bloody nose or bloody lip, but it was nothing serious.  Ex. D24 at 27:19-30:17, Ex. D25 at 32:10-34:8 (Doyle).[3]

---

[3]  Bowen testified that she ran upstairs when she heard the sound that was probably the chair tipping over.  She was angry because the noise could have awakened her children.  She said that, while she was there, Maestas punched Solwick three or four times in the face, causing him to bleed profusely, and Doyle took Solwick into the bathroom to clean him up.  When they came out, Solwick was no longer bleeding.  She left shortly thereafter.  At that time, she said, "[t]hey were all relaxed and laughing."  Ex. D15 at 32:1-38:10 (Bowen).

According to Maestas and Day, Doyle did not leave.  Maestas hit Solwick three or four times in the face.  Solwick began to bleed profusely. Day said Solwick was "a cop caller" and tipped his chair over, dumping him out of it.  Doyle and Maestas then attacked Solwick.  Maestas kicked Solwick and held a knife to his throat.  Day tried to leave when she saw Solwick pick up a hammer, but she had to get past Doyle, Maestas and Solwick to get out the door.  She thought Doyle took the hammer away from Solwick before she left.  Maestas testified that Doyle struck Solwick several times with the hammer.  Maestas and Doyle left sometime after that.  Ex. D10 at 7:7-15, 26:6-27:9, 28:10-29:22,[4] 31:15-41:24 (Maestas); Ex.D19 at 17:2-25:15 (Day).

When Day left, she went to her friend Bill Spencer's house.  When Maestas left, he also went to Spencer's house; Spencer was his father-in-law.  Maestas and Day together returned to Solwick's apartment shortly after 3:00 in the morning – either to check on his welfare, as Spencer and Maestas testified, or to take his money, as Day testified.  Solwick lay

---

[4]  Maestas testified that Doyle tipped over Solwick's chair, but Day said she did.

motionless on the floor of his bedroom.  Day wiped off the hammer lying near him.  She also took Solwick's wallet, which contained $11, and discarded it near the Helsinki Bar.  Ex. D11 at 3:18-4:22 (Maestas); Ex. D18 at 39:17-40:23 (Spencer); Ex. D19 at 26:21-34:13, Ex. D20 at 27:20-28:3 (Day).

At 6:00 or 7:00 in the morning, Maestas went to Bowen's apartment looking for Doyle.  He and Bowen went into Solwick's apartment.  When they returned to Bowen's apartment, Maestas called Dunn.  When Dunn arrived, Maestas, Bowen, and Dunn went into Solwick's apartment.  Dunn took the hammer and eventually put it under the passenger seat of his vehicle.  On returning to Bowen's apartment, Maestas and Dunn asked Bowen how to find Doyle.  She told them he was probably at his sister's house.  Ex. D11 at 8:15-16:3 (Maestas); Ex. D14 at 5:17-8:18 (Dunn); Ex. D15 at 40:16-50:8 (Bowen).

Police were alerted on the morning of March 4, when Solwick's landlord stopped in at his apartment to collect the rent and saw him lying on the bedroom floor.  Ex. D3 at 32:21-36:2 (Forest).  The apartment was in disarray.  Investigators found medium-velocity blood spatter evidence,

indicating blows with fists or objects, at numerous locations throughout the apartment, including the ceiling molding in the bathroom.  There were many blood smears as well.  E.g., Ex. D4 at 74:4-92:18, Ex. D5 at 9:9-19:7 (Lester).  Forensic analysis of a beer can found in the bathroom showed Doyle's fingerprint overlapping a substance that appeared to be blood and contained Solwick's DNA.  Ex. D8 at 63:10-64:18 (Hutchinson); Ex. D9 at 42:9-23 (Byrne).  Solwick's death was probably caused by blunt force trauma to his head, but it might also have been caused by suffocation. Aspiration of blood was not the primary cause.  Ex. D8 at 30:22-31:19 (Dale).

Doyle and Maestas were almost immediately identified as suspects by a Crimestoppers tip.  Doyle left Butte and went to Yakima, San Diego, and Missouri before returning to Butte.  He contacted Detective Jerome McCarthy by cell phone on several occasions while he was on the run.  Ex. D27 at 37:24-42:19 (Doyle).

On March 7, 2003, in one of their phone conversations, McCarthy asked Doyle whether Solwick had anything in his apartment, such as a baseball bat or a pipe, that could have been used as a weapon.  Doyle said

he loaned his hammer to Solwick.  In an interview on March 27, after Doyle had returned to Butte, McCarthy asked the same question.  On that occasion, Doyle said there was nothing.  Ex. D25 at 38:23-40:19 (Doyle).

Doyle also said that Maestas was wearing black or dark-colored jeans and a Starter jacket that night.  Freshly laundered blue jeans – not dark – with forensic traces of blood were found at Maestas's house.  Doyle was seen on a video surveillance film at a local convenience store wearing dark or black jeans and a Starter jacket on March 2, 2003.  Ex. D25 at 35:6-37:22 (Doyle).  Black jeans were found in the kitchen garbage can at the house of Maestas's friend John Dunn.  Solwick's and Doyle's blood and DNA were on them.  Doyle denied ever having met Dunn, but Dunn knew Doyle had a black eye on March 4, and cell phone records showed several calls between Dunn's and Bowen's phones on March 4.  Bowen testified that she and Doyle were at Dunn's house with Maestas for ten or fifteen minutes on March 4.  Ex. D8 at 51:3-59:11 (Hutchinson); Ex. D16 at 3:7-6:16 (Bowen); Ex. D21 at 7:10-9:17 (Miller); id. at 39:3-42:14 (McCarthy); Ex. D25 at 23:23-24:5, 25:23-25, 26:20-27:9 (Doyle).

Doyle was arrested on May 5, 2003.  On May 30, he was charged by

information in Montana's Second Judicial District Court, Butte-Silver Bow, with deliberate homicide, in violation of Mont. Code Ann. § 45-5-102(1) (2003), or, in the alternative, deliberate homicide by accountability, id. § 45-2-302.  Pet. (doc. 1) at 2 ¶ 1;  State v. Doyle, 160 P.3d 516, 522 ¶ 10 (Mont. 2007).

Maestas and Day pled guilty to deliberate homicide by accountability.  Both testified against Doyle.  The State agreed to recommend a thirty-year sentence for Maestas.  Day was sentenced to twenty years.  Ex. D10 at 6:1-17 (Maestas); CONWeb, http://app.mt.gov/conweb (accessed Jan. 15, 2010).[5]

Doyle's trial commenced on January 3, 2005.  Ex. D1 at 5:8-14. Doyle's defense was that Maestas and Day killed Solwick, probably for his cash.  Three people testified that Doyle admitted killing Solwick.  Bowen admitted she told Harrington on August 31, 2004, that Doyle told her he suffocated Solwick "[b]ecause he didn't want Richard Solwick to call the cops," but at trial she said she was wrong about that.  Ex. D16 at 8:25-10:7

---

[5]  The defense attempted to examine Day at trial about her plea agreement.  She could not read it because she did not have her glasses, and she could not recall or explain its terms.  Ex. D19 at 39:20-45:8 (Day).

(Bowen); Ex. D20 at 53:6-11 (Harrington).  Bowen's sister, Cindy Boggess, reported that she was present when Doyle admitted suffocating Solwick "to put him out of his misery because he'd been beaten terribly."  Ex. D20 at 57:15-17 (Harrington).  At trial, Boggess vehemently denied saying why Doyle did it but agreed he admitted suffocating Solwick.  <u>Compare</u> Ex. D17 at 19:14-25 <u>with</u> <u>id.</u> at 25:5-26:4 (Boggess).  Dunn testified that Doyle said "he knew that [Solwick] was dead because he'd felt his last breath come out on his hand."  Ex. D14 at 14:19-20 (Dunn).

The jury deliberated for ten hours on the first day, from 8:30 to 4:45 on the second day, and for about four hours on the third day.  <u>See</u> Ex. D29 at 27:23-37:8.  Doyle was acquitted of deliberate homicide but found guilty of deliberate homicide by accountability.  Ex. D29 at 37:16-23 (verdict). On April 13, 2005, he was sentenced to serve 65 years in prison.  Pet. at 2 ¶ 2; <u>id.</u> at 3 ¶¶ 4, 6.

Doyle appealed.  On May 31, 2007, the Montana Supreme Court affirmed his conviction.  <u>Doyle</u>, 160 P.3d at 521 ¶ 1.

In October 2007, Doyle filed a petition for postconviction relief in the trial court.  When the petition was denied, Doyle again appealed.  On

March 31, 2009, the Montana Supreme Court affirmed the trial court's denial of postconviction relief. <u>Doyle v. State</u>, No. DA 08-0218 (Mont. Mar. 31, 2009) (unpublished disposition).

Doyle timely filed his petition in this Court on July 8, 2009. Pet. at 8, Pet'r Decl. ¶ C; <u>Houston v. Lack</u>, 487 U.S. 266, 270-71 (1988) (establishing prison mailbox rule).

## II. <u>Doyle's Allegations</u>

Again, this document addresses only Claims 1-4.

First, Doyle contends that his Sixth Amendment right to a speedy trial was violated to his prejudice because he experienced significant anxiety, witnesses' memories faded, the State used the delay to coerce his family members to testify against him, and he suffered permanent physical damage because he was not permitted to participate in prescribed physical therapy following back surgery. Pet. at 9.

Second, Doyle claims that his Sixth Amendment right to confront the witnesses against him was violated because the trial court restricted his cross-examination of Dean Maestas. <u>Id.</u>

Third, Doyle asserts that his Fourteenth Amendment right to due

process was violated because the evidence was not sufficient to support a verdict against him for deliberate homicide by accountability.  Id.

Fourth, Doyle alleges that the trial court violated his Fourteenth Amendment right to due process by erroneously instructing the jury on the mental state of purposely or knowingly, thus failing to communicate that the State must prove that element beyond a reasonable doubt.  Pet. at 10.

III.   Analysis

The Montana Supreme Court addressed the claims at issue here on the merits on direct appeal.  Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as a precondition to obtaining relief, Doyle must first show that the Montana Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2).

A state court's decision is "contrary to [the Supreme Court's] clearly

established precedent if the state court applies a rule that contradicts the governing law set forth in [its] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. A federal court sitting in habeas must be convinced that the state court's decision is "more than incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). The state court's decision must be "objectively unreasonable," id. – a "substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams, 529 U.S. at 410).

"When 'the requirement set forth in § 2254(d)(1) is satisfied, a federal court must then resolve the constitutional claim without the deference AEDPA otherwise requires.'" Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) (quoting Panetti v. Quarterman, 551 U.S.

930, 953 (2007)) (internal brackets omitted).

A.  Claim 1: Speedy Trial

1.  Clearly Established Federal Law

"[T]he right to a speedy trial is a more vague concept than other procedural rights.  It is . . . impossible to determine with precision when the right has been denied."  Barker v. Wingo, 407 U.S. 514, 521 (1972). Consequently, there is no federal rule setting forth a specific period of time within which a trial must commence.  Courts consider the conduct of both the prosecution and the defense and employ a balancing test weighing the length of the delay between charge or arrest and trial, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether he was prejudiced as a result of the delay.  Id. at 530.

> We regard none of the four factors . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.  But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

Id. at 533.

    2.  The Montana Supreme Court's Opinion

    At the time of Doyle's case, the Montana Supreme Court sequenced

the Barker factors in a burden-shifting scheme triggered by the number

of days of delay attributable to the State as opposed to the defendant.

Doyle, 160 P.3d at 523 ¶ 18 (citing Barker and City of Billings v. Bruce,

965 P.2d 866, 871 ¶ 19 (Mont. 1998)).  After its decision in Doyle's case,

the Montana Supreme Court revised its speedy trial analysis because it

concluded that it had "strayed considerably from the actual balancing

approach envisioned in Barker."  State v. Ariegwe, 167 P.3d 815, 828 ¶ 27

(Mont. 2007); see also id. at 839 ¶ 72 (Mont. 2007) (overruling Doyle on

manner of allocating responsibility for delay and burden of proof).

    For that reason, in an abundance of caution, this Court will not defer

to the decision of the Montana Supreme Court under 28 U.S.C. § 2254(d)

or (e)(1) but will address Doyle's speedy trial claim de novo.   Doyle had a

full and fair opportunity to develop the facts in support of his claim at the

speedy trial hearing and at trial.  See Ex. D22 at 25:25-26:1, Ex. D29 at

18:24-25 (renewing motion to dismiss for speedy trial violation at the close

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 15

of the State's evidence and at the close of all the evidence).   Therefore, 28

U.S.C. § 2254(e)(2) applies.    Doyle is not entitled to an evidentiary

hearing.

### 3.  Balancing the Barker Factors

Doyle was arrested on May 5, 2003.  Trial began on January 3, 2005,

609 days later.[6]  Before trial, Doyle filed a motion to dismiss under the

Sixth Amendment's guarantee of a speedy trial.  The trial court held a

hearing on the motion on December 14, 2004, three weeks before trial.

### (a)  Relevant Facts

Evidence was submitted to the State Crime Lab for analysis on April

27, 2003.  Ex. B1 at 10:11-13.  Doyle was arrested on May 5, 2003.  Trial

was set for December 15, 2003.  Ex. F2 (Case Register Report) at 9 No. 32.

On November 4, 2003, Doyle's attorneys, Greg Jackson and David

Vicevich, filed a motion for continuance because final results had not yet

been obtained from the lab.  Ex. B1 at 9:1-13, 11:9-16.

As of January 13, 2004, the defense still did not have a final report

---

[6]  In the state court proceedings, this interval was described as 598 days.  It is 609 days.  See http://www.timeanddate.com/date/duration.html (accessed Jan. 15, 2010).

from the lab as to most items.  Ex. B1 at 12:22-13:1.  On March 22, 2004, trial was set for June 1, 2004.  Ex. F2 at 10 No. 58.  The defense received final lab results on April 19, 2004.  Ex. B1 at 19:13-22.  On April 21, 2004, the defense requested samples of some items for its own expert's analysis.  Ex. B1 at 14:13-22.  On the same day, trial was reset for June 7, 2004.  Ex. F2 at 12 No. 86.

On May 11, 2004, the defense filed a motion to continue, Ex. B1 at 29:16-18, predicated in part on the recent receipt of the lab results but also in part on continuing efforts to locate defense witnesses and retain an expert to evaluate the autopsy report, id. at 36:12-22.  Trial was reset for September 20, 2004.  Ex. F2 at 12 No. 94.

On September 9, 2004, the defense moved to continue trial because statements made on August 31 by Bowen and Boggess created a conflict of interest for Doyle's counsel, who had previously represented one or both of them.  Ex. B1 at 27:25-29:18, 42:13-17, 46:4-47:20.  New counsel Palmer Hoovestal and Walt Hennessey were appointed and trial was reset for December 13, 2004.  Ex. F2 at 14 No. 124.  On November 16, 2004, new counsel filed a motion to dismiss based on a speedy trial violation.  Id. at

15 No. 132.[7]  On November 30, 2004, the trial was continued to January

3, 2005.  Id. at 16 No. 139.  A hearing on the speedy trial motion was held

on December 14, 2004.  The trial court denied the motion a week later.

Trial commenced on January 3, 2005.  Id. at 17 No. 145; Ex. B1 at 4:6-12;

Ex. D1 at 5:8-14.

(b)  Discussion

The initial trial setting for December 15, 2003, was 224 days after

Doyle's arrest.  "[T]he ordinary procedures for criminal prosecution are

designed to move at a deliberate pace."  United States v. Ewell, 383 U.S.

116, 120 (1966), quoted in Barker, 407 U.S. at 521 n.15.  The first trial

setting permitted a reasonable period of time for trial preparation for both

parties.  They share responsibility for it.

There was significant delay between submission of materials to the

state crime lab in April 2003 and the return of finalized results in April

2004.  The record does not indicate that additional evidence was seized

and submitted for analysis during this year-long period; on the contrary,

_____

[7]  On November 23, 2004, an "Objection to Trial Setting" was filed.
Ex. F2 at 15 No. 131.  Neither the docket nor the record indicate who filed
it or what it said.

it suggests that the lab received all the evidence a little less than two months after Solwick's death and before Doyle was arrested.  Jackson said, apparently with respect to all but the September 2004 motion for continuance, "but for not receiving the scientific evidence, we would have and could have been prepared to go to trial."  Ex. B1 at 38:13-19.

While it was Doyle who moved to continue the December 2003 trial, that fact is not decisive.  Only preliminary laboratory results had been disclosed.  A defendant cannot be forced to abandon his right to a fair trial to realize his right to a speedy one.[8]  The entire period between the first and the second trial date, June 7, 2004, or 175 days, was caused by the lab's delay and must be attributed to the State.

On the other hand, there was a lot of evidence to analyze.  Former defense counsel called it "a mountain of evidence."  Ex. B1 at 9:7.  Lori Hutchinson, the forensic scientist who analyzed the DNA and blood samples, called Solwick's murder "the largest case I've ever worked."  Ex. D8 at 60:3.  The record shows neither deliberate nor even negligent delay.

---

[8] The prosecutor's argument at the hearing was "you can't have your cake and you can't eat it too."  Ex. B2 at 37:11-12.

The lab's delay is similar to that caused by overcrowded dockets among state trial courts, not deliberate or exploitive but nonetheless the State's responsibility.  Barker, 407 U.S. at 531.

The delay occasioned by Doyle's May 2004 motion for a continuance, when trial was moved from June to September, was due in part to the lab's delay but also in part to other matters.  The record does not suggest the autopsy results were new or that anything had prevented the defense from identifying or locating witnesses earlier.  The State and the defense share responsibility for the 105-day delay between the June and September trial dates.

The September trial date had to be continued to allow for a change of defense counsel.  Like the delay caused by the state crime lab, the sheer necessity of the substitution of counsel does not prevent the 84-day delay from being fairly charged to one party – in this instance, Doyle.  Barker, 407 U.S. at 529; see also Vermont v. Brillon, __ U.S. __, 129 S. Ct. 1283, 1290 (2009).

Finally, the brief continuance from December 13, 2004, to January 3, 2005, apparently resulted from the need to set a hearing on Doyle's

motion to dismiss and to avoid starting a trial over the holiday season. Responsibility for that 21-day period is, again, shared by both parties.

Doyle attempted to show that the State used the delay to coerce Bowen into changing her story, e.g., Ex. B1 at 47:3-48:13, though she was not called to testify at the speedy trial hearing. Bowen's children were removed from her custody sometime between March 3, 2003, when she took her son to school and picked him up afterward and had the baby with her, and Doyle's arrest on May 5, 2003.

Bowen gave two or three statements in March 2003. At trial, she testified that, just after Doyle's arrest in May 2003, McCarthy told her she would get a "package deal" if she gave a statement incriminating Doyle and "I would have my kids back the next day." Bowen did not give a statement incriminating Doyle at that time or for more than a year afterward. Ex. D16 at 26:1-27:10. In August 2004, when trial was set for September 20, Bowen received a notice requiring her to appear in the county attorney's office. On August 31, she said, she gave an incriminating statement because "[i]t seemed like it would get DFS [the Department of Family Services] off my back for a while." Id. at 27:13-14.

"[F]rom August till December, I did not have a social worker or talk to a social worker for the whole time."  In December 2004, shortly before trial commenced, a social worker resumed weekly contacts.  Id. at 27:18-24.[9]

Even assuming Bowen was a credible witness,[10] her testimony does not support an inference that the State used the delay to badger Bowen (and/or Boggess) into incriminating Doyle.  Bowen did not say that the authorities investigating Solwick's murder were in touch with her at all between May 2003 and August 2004.[11]  She did not say that any social worker even vaguely connected her children's status with Doyle's criminal case.  There is no evidence suggesting that the investigation into Solwick's murder was any part of the reason the children were removed or kept from Bowen's custody.  Finally, there is no evidence that the State

---

[9]  Boggess said both that Bowen's children were returned to her custody in February 2004, Ex. D17 at 42:19-25, and that they would be returned later in January 2005, id. at 45:22-46:7.  No one asked Bowen about the status of her children at the time of trial.

[10]  McCarthy testified that he did not speak with Bowen or Boggess on May 5, 2003.  Ex. D21 at 44:13-45:7.

[11]  Bowen and Boggess met with Harrington and prosecutor Cox at the Hanging Five, a family-style restaurant in Butte, on August 25, 2004.  Ex. D17 at 10:1 (Bowen); id. at 46:17-18 (Boggess); Ex. D20 at 49:20-50:15 (Harrington).

deliberately created delay while Bowen was dealing with family services. Bowen's allegations do not affect the speedy trial analysis.

Doyle showed some prejudice as a result of the delay. Witness Kay Paige died. There is no indication that the defense was able to question her. Other witnesses – including Doyle's sister Sandy Bertek, his nephew Casey Steineke, and Steineke's girlfriend Lindsay Chapman – could not be found. Those witnesses gave statements. There is no indication in the record as to what they said, but the State did not claim their loss was detrimental to it, as it did with Paige's testimony. Ex. B2 at 19:14-20:17.

Due to his incarceration, Doyle was unable to have contact with the daughter he shared with Bowen and unable to be involved in custody decisions about her. And he testified, without contradiction, that he was detained in a crowded temporary facility under unusual and unpleasant conditions.[12] Such detention is prejudicial because "[l]engthy exposure to

_____

[12]  See Doyle, 160 P.3d at 525 ¶¶ 30-32; see also, e.g., Ex. B1 at 51:23-54:21, 59:3-64:25, 71:14-73:1. This Court does not understand the Montana Supreme Court's conclusion that "Doyle presents a catalog of complaints about jail conditions, but makes no argument and presents no evidence that the delay enhanced his level of anxiety and concern." Id. at 525 ¶ 31.
    Doyle's medical complaints were the subject of a civil action under

these conditions has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult." <u>Barker</u>, 407 U.S. at 520 (internal quotation marks and footnote omitted).

Doyle personally asserted his speedy trial right on July 2, 2003, two months after his arrest, in a letter to the presiding judge. Ex. B1 at 23:16-24:3. He also discussed the issue frequently with counsel and, as Jackson testified, "would not waive his right to a speedy trial." <u>Id.</u> at 23:8-9. Doyle sought on three occasions to have his bail decreased so that he could be released from pretrial incarceration. As the prosecutor pointed out, his motions did not adduce any new facts – except, necessarily, the passage of time. Ex. B2 at 38:18-39:4; Ex. F2 at 7-8 No. 10, 8 No. 28, 12 No. 96. Finally, of course, he moved for dismissal before trial commenced.

Even so, the prejudice Doyle suffered does not, under the circumstances here, weigh enough to tip the balance against the State.

---

42 U.S.C. § 1983 filed in this Court. The defendants' motion for summary judgment was granted on June 5, 2008, because there was no evidence that his pain was uncontrolled or that he experienced more or chronic pain or mobility limitations as a result of his incarceration. <u>Doyle v. Butte Silver Bow County Comm'rs</u>, Cause No. CV 05-66-BU-SEH (D. Mont. judgment entered June 9, 2008). Nonetheless, Doyle's medical issues probably exacerbated his subjective anxiety about awaiting trial in jail.

When the delay is great and attributable to the State, prejudice is presumed and intensifies over time.  United States v. Mendoza, 530 F.3d 758, 764 (9th Cir. 2008) (citing United States v. Shell, 974 F.2d 1035, 1036 (9th Cir. 1992), and McNeely v. Blanas, 336 F.3d 822, 831 (9th Cir. 2003)). Here, however, not all of the delay is attributable to the State, nor was the State responsible for deliberate or even negligent delay.  Thus, Doyle must show relatively more substantial evidence of prejudice.  Id.

Paige witnessed a relatively peripheral event.  All the testimony indicated Doyle was at his sister's house at daybreak on March 4.  Other evidence – forensic evidence and testimony from Bowen, as well as Dunn and Maestas – placed Doyle with Dunn and Maestas later in the day. Whatever Paige saw, it is unlikely she could have refuted the connection between Dunn and Doyle.  Likewise, the record before this Court does not suggest that Bertek, Steineke, or Chapman had relevant evidence.  While they might have known when Doyle arrived at Bertek's house or how long he was there, Doyle never said so.

In sum, 609 days is undoubtedly a long time to await trial.  Doyle and the State share responsibility for 350 of those days.  That period, by

itself, was a reasonable time for trial preparation.  Of the remainder, the State was responsible for 175 days, Doyle for only 84 days.  Doyle was certainly timely in his assertion of his right to a speedy trial, and he can show some prejudice.  His medical condition was a legitimate cause of concern, even if not actionable, and his lengthy detention in the conditions he described also weighs in his favor.

But the evidence does not show deliberate or exploitive behavior by the State, even with respect to Bowen's situation with her children.  It is clear in the record that the amount of evidence submitted for forensic analysis was extraordinary.  Moreover, because the State's 175-day delay plainly was caused by the magnitude of the lab's task, and because the State was not at fault in any delay after the superseded June 2004 trial date, the record does not support an inference that the State exploited the unpleasant conditions in which Doyle was detained.  Finally, the last lengthy delay was occasioned by Doyle's change counsel.  These facts counterbalance Doyle's timely assertion of his right to a speedy trial.

Considering all the evidence, the State made a diligent, good-faith effort to bring Doyle to trial.  A certificate of appealability is warranted

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 26

because Doyle's claim is not without substance, but this Court should conclude that his Sixth Amendment right to a speedy trial was not violated.

   B.  Claim 2: Confrontation Clause

   Doyle claims his Sixth and Fourteenth Amendment right to confront the witnesses against him was violated when the trial court prohibited him from asking Dean Maestas about his criminal history and from following up on Maestas's comment about how he "usually" fights.  Pet. at 9.  "[A] state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process."  Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).

   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (internal citations omitted).  Rules

that "infringe[] upon a weighty interest of the accused" and are "arbitrary" or "disproportionate to the purposes they are designed to serve" violate the right to present a defense.  United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock v. Arkansas, 483 U.S. 44, 58 (1987)).[13]  At the same time, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Holmes, 547 U.S. at 326.  Consequently, trial courts must balance the defendant's interest in presenting the evidence against

---

[13]  E.g., Holmes v. South Carolina, 547 U.S. 319, 328-29 (2006) (defendant denied due process where state rule precluded him from introducing evidence to implicate third party); Scheffer, 523 U.S. at 309 (defendant not denied due process where military court rule precluded all polygraph evidence because rule ensured reliability of evidence and admission of such evidence would infringe on jury's role in determining weight and credibility of witness testimony); Rock, 483 U.S. at 61 (defendant denied due process where state rule precluded all hypnotically refreshed testimony, absent showing that all such testimony was invalid); Crane, 476 U.S. at 691 (defendant denied due process where state rule precluded defendant from offering evidence to show confession was not voluntary); Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (defendant denied due process where state rule precluded defense from impeaching its own witness); Washington v. Texas, 388 U.S. 14, 22-23 (1967) (defendant denied due process where state rule precluded defense from calling as a witness a person already convicted of the same crime).

the legitimate ends the State might achieve by excluding it, and its balancing must not result in a decision that is arbitrary or unrelated or out of proportion to the State's ends.  Id. at 331.

A showing of relevance is a long acknowledged and entirely permissible restriction on a defendant's right to present evidence in his defense:

> The accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . Such evidence may be excluded . . . where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial[.]

Holmes, 547 U.S. at 327 (quoting 40A Am. Jur. 2d Homicide § 286 at 136-38 (1999)) (internal brackets omitted) (first ellipsis in Holmes).  Relevant evidence is generally defined as any evidence tending to make a fact that is material to the verdict more or less likely to be true.  E.g., Mont. R. Evid. 401; Fed. R. Evid. 401.

## 1.  Maestas's Criminal History

On direct examination, Maestas testified that he punched and kicked Solwick and held a knife to his throat.  Ex. D10 at 7:7-15.  He admitted he

lied to investigators about his own involvement in Solwick's death to avoid responsibility.  <u>Id.</u> at 6:21-7:6.  He also said he was "scared" and had "never had anything like this ever happen to me."  "I've never seen a dead body.  I've never watched somebody be killed."  Ex. D11 at 30:9, 14-15, 18-19.

On cross-examination, Doyle sought to introduce evidence that Maestas had been convicted of felony theft, felony burglary, misdemeanor assault, partner or family member assault, disorderly conduct, and misdemeanor forgery.  He also contended that "Mr. Maestas assaulted an individual . . . [who] was severely beaten . . . and . . . sustained severe injuries," although no criminal charges were filed as a result.  Ex. D11 at 32:4-25.  The trial court asked whether Maestas's criminal history included "any felony assaults or aggravated assaults or anything of that nature."  Doyle responded, "No." <u>Id.</u> at 33:2-4.  The trial court prohibited Doyle from referring to Doyle's convictions or to the alleged assault.  <u>Id.</u> at 33:5-24.

The Montana Supreme Court held that "the crimes would not have discredited" Maestas's testimony and, at any rate, Doyle "razed Maestas's

credibility on cross examination by drawing out several inconsistencies between Maestas's testimony at trial and the statements he gave detectives during the investigation." <u>Doyle</u>, 160 P.3d at 527 ¶ 48.  The record supports that ruling.  Maestas's criminal history had little if any probative value, and exploration of his unproven attack in an unrelated incident had equally slight probative value.  In addition, several patrons of the Corner Bar testified that Maestas was drunk and looking for a fight on the night of March 3.  Doyle is not entitled to relief on this portion of his Confrontation Clause claim.

### 2. <u>Character Evidence</u>

Doyle also sought to link Maestas with Solwick's physical injuries. He tried to show that a peculiar mark on Solwick's philtrum – the groove between the nose and upper lip – was caused by a blow from Maestas, who was wearing a wedding ring set with sharp-edged stones.  Ex. D11 at 55:5-57:7; Appellant Br. (doc. 1-1) at 18 n.5, <u>Doyle</u>, No. DA 05-362.  Doyle contends that his ability to confront Maestas was unfairly limited by the trial court's sustaining of the State's objection in the following exchange:

Q.    Surely, you struck Mr. Solwick with your left hand?

A.    I may have.

Q.    You don't recall?

A.    I probably did.  I swung with both hands.

Q.    You can't remember?

A.    Not that I can't remember.  Normally, when I'm fighting, I swing with both arms, you know, both hands.

Q.    Do you fight normally?

      Mr. Cox:        Objection.

A.    When I have to.

      The Court:       Sustained.

Q.    Well, you didn't have to fight on March 4th, 2003, did you?

A.    Probably not.

Q.    In fact, you went up to this apartment at 937 West Broadway with the intention to fight, agreed?

A.    Agreed.

Q.    You were loaded for bear?

A.    If that's what you want to call it.

Q.    Well, I want to say what you said.  You were loaded for bear or not?

A.   Yeah.

Q.   You were, weren't you?

A.   Yes, I was.

Q.   You not only punched Mr. Solwick, but you took the knife to his throat, agreed?

A.   Agree.

Q.   And you cut him?

A.   Yes.

Q.   And you kicked him when he was laying down?

A.   Yeah.

Q.   How many times?

A.   Twice.

. . .

Q.   Now, Mr. Maestas, you see the picture of Mr. Solwick's face there as he was discovered –

A.   Yes.

Q.   – at the crime scene?  Do you see those marks on his face on his lip area?

A.   Yes.

Q.   Did you put those marks on his face with your ring when you were punching him in the face?

A.   I don't know.  I may have.

Q.   What do you mean you may have?

A.   Well, I struck him on the face.

Ex. D11 at 57:8-58:16, 59:5-15.

The Montana Supreme Court held that "[e]vidence of a person's character is generally inadmissible for the purposes of proving action in conformity therewith."  <u>Doyle</u>, 160 P.3d at 527 ¶ 50 (citing Mont. R. Evid. 404(a)); <u>see also</u> Fed. R. Evid. 404(a).  Doyle does not identify any evidence that the jury was actually prevented from considering.  He was certainly able to make the link he was attempting to make.  He was not prejudiced by the trial court's ruling.  Again, there was nothing unreasonable about the Montana Supreme Court's opinion.  Doyle is not entitled to relief on this portion of his Confrontation Clause claim.  Claim 2 should be denied.

C.   <u>Claim 3: Sufficiency of the Evidence</u>

1.   <u>Pleading Standard</u>

The State argues that Doyle's federal petition does not raise Claim

3 as a federal issue.  Br. in Supp. of Answer (doc. 14) at 3-4.  A federal habeas petition is not governed by the standards governing petitioners' presentation of claims in state court.  All pro se pleadings, including habeas petitions, must be liberally construed.  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); United States v. Seesing, 234 F.3d 456, 462 (9th Cir. 2000).

Unlike many other claims, such as ineffective assistance of counsel, a claim alleging insufficient evidence can only mean one thing.  Either the evidence is sufficient or it is not.  And, as the State notes, a petitioner may not state a claim for relief under state law in a federal habeas petition.  Therefore, all of Doyle's claims in the federal petition must be construed in light of federal law.  Liberal construction is not pushed too far in this case by a literal construction of Claim 3.

### 2.  Exhaustion and Procedural Default

The State argues that Claim 3, in which Doyle alleges that the evidence was not sufficient to support his conviction, was not fairly presented in the state courts because Doyle's brief on direct appeal did not link the facts he alleges in his federal petition with a federal legal theory.

Br. in Supp. of Answer (doc. 14) 4-8.

> Doyle's federal petition alleges:
>
> C. Ground Three.   Sufficiency of the Evidence for
> Accountability. . . .
> There was no evidence at trial that link[ed] Doyle to this crime
> only testimony[] of those who[] stood to gain something from
> testifying against Doyle[.]   Maestas and Day avoid[ed] life
> sentence[s].   Dunn avoided being charged.   Bowen would get
> custody of her children return[ed], and there w[as] conflicting
> testimony from all these witnesses and each had been proven
> to be untruthful[] several times when asked to give
> statements.   Each gave multiple statements.

Pet. at 5 ¶ 15C; id. at 9 para. 3.

While most of this claim is directed at the credibility of Maestas,
Day, Dunn, and Bowen, Doyle also asserts there was "no evidence" to link
him to "this crime," that is, deliberate homicide by accountability.   The
Montana Supreme Court addressed that issue.   See Doyle, 160 P.3d at 527
¶ 52 ("Whether sufficient credible evidence exists to support Doyle's
conviction of deliberate homicide by accountability.").   Doyle calls the
whole of the evidence into question, not just the specific facts surrounding
the four named witnesses.

The same is true of Doyle's brief on direct appeal.   The entire claim

relies on federal law requiring proof beyond a reasonable doubt, in light of all the evidence, to sustain a guilty verdict.   Appellant Br. at 46-55, Doyle, No. DA 05-362.   Claim 3 was properly exhausted and is not defaulted.

      3.   Merits

Witness credibility, as the State asserts, is not a federal legal issue. It is for the jury to decide.   Comer v. Schriro, 480 F.3d 960, 986 (9th Cir. 2007) (en banc) (per curiam); Sandoval v. Calderon, 241 F.3d 765, 773 (9th Cir. 2000).   No federal law prohibited or restricted the State from presenting witnesses who were themselves implicated in the crime, who gave contradictory statements, or who stood to benefit from testifying. The Confrontation Clause guaranteed Doyle an opportunity to point out these facts to the jury.  He did.  E.g., Ex. D11 at 46:12-47:25 (Maestas); Ex. D14 at 31:18-32:22 (Dunn); Ex. D16 at 25:16-27:24 (Bowen); Ex. D20 at 22:15-27:18 (Day).

Moreover, there was evidence in addition to the evidence provided by Maestas, Day, Dunn, and Bowen.  As set forth in the Background section above, forensic analysis and Doyle's statements tended to

corroborate the witnesses' testimony and/or substantiate his commission of the crime.

Finally, Doyle's claim that no evidence linked him to "this crime," that is, deliberate homicide by accountability, can only arise from a misunderstanding of what the State was required to prove.  Aiding and abetting and accountability theories frequently result in convictions that are constitutional under federal law even though no jury or court decides exactly who did what.  The State proved beyond a reasonable doubt that both Doyle and Maestas meant to inflict serious injuries on Solwick.  The State proved beyond a reasonable doubt that Solwick died as a result of his injuries.  That is all that is required under state law.  Federal law requires no more.

Even if review of the sufficiency of the evidence were not doubly deferential in federal habeas proceedings, Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (describing compound effect of 28 U.S.C. § 2254(d) and Jackson v. Virginia, 443 U.S. 307, 319 (1979)), the evidence here was sufficient to support Doyle's conviction.  This claim should be denied.

D.  <u>Claim 4: Jury Instruction on Mental State</u>

Finally, Doyle contends that the trial court's instruction on the mental states of "purposely" or "knowingly" absolved the State of proving the mental element beyond a reasonable doubt and also confused the jury and commented on the evidence.  Pet. at 10; <u>see also</u> Pet. (doc. 1-2) at 1.

Under Montana law, the offense of deliberate homicide does not require specific intent to cause death.  It requires only that a person act purposely or knowingly and that the person know his action is likely to cause injury, even if "the precise harm or injury" – here, Solwick's death – "was different" than, say, the physical injury contemplated by someone who strikes another in order to cause pain.  There is no criminal liability if "the actual result is too remote or accidental to have a bearing on the Defendant's liability or on the gravity of the offense."  Mont. Code Ann. § 45-2-201(2)(b).

In other words, if Doyle or Maestas slapped Solwick and Solwick died as a result, the actual result might be too remote or accidental to support liability for deliberate homicide.  But hitting someone hard and repeatedly in order to seriously hurt them is knowingly causing the "same

kind of harm or injury" as purposefully beating someone to death. And a person who knowingly helps another to seriously injure someone and who does so in order to cause pain to the victim is subject to liability for deliberate homicide under an accountability theory when the victim dies from his injuries. Mont. Code Ann. §§ 45-2-201(2), -302(a)(3).

There is no clearly established Federal law "limiting the traditional recognition of a State's capacity to define crimes and defenses" in this context. Clark v. Arizona, 548 U.S. 735, 749 (2006). "Purposely or knowingly" means what Montana law says it means. The Montana Supreme Court said the trial court's instruction accurately stated Montana law. Doyle, 160 P.3d at 530 ¶ 69; see also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("Today we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions."); Wisconsin v. Mitchell, 508 U.S. 476, 483 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute."). Therefore, the State was not relieved of its burden to prove beyond a reasonable doubt that Doyle acted purposely or knowingly. This claim should be denied.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 40

IV.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Cases.

A.  Governing Law

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c); Hohn v. United States, 524 U.S. 236 (1998); Lambright v. Stewart, 220 F.3d 1022, 1024 (9th Cir. 2000).  Doyle "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Slack v. McDaniel, 529 U.S. 473, 484 (2000), or that "the questions are 'adequate to deserve encouragement to proceed further,'" Lozada v. Deeds, 498 U.S. 430, 432 (1991) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

B.  Discussion

As noted above, a COA is warranted as to the speedy trial claim, Claim 1.

Doyle fails to identify any relevant, probative evidence he was

actually prevented from presenting to the jury in his cross-examination of Dean Maestas.  There is no substance to his Confrontation Clause claim.  A COA is not warranted as to Claim 2.

As set forth in the Background section above, the evidence was constitutionally sufficient to support the verdict against Doyle on an accountability theory.  Again, there is no substance to Claim 3, and a COA is not warranted.

Finally, the mental state pertinent to the crime is defined by state law, and the Montana Supreme Court held that the trial court's instructions accurately stated the law.  That conclusion is binding on this Court and, for the sake of clarity, is obviously correct.  A COA is not warranted as to Claim 4.

Based on the foregoing, the Court enters the following:

<u>RECOMMENDATION</u>

1.  Claims 1, 2, 3, and 4 of the Petition should be DENIED on the merits.

2.  A certificate of appealability should be GRANTED as to Claim 1

on the issues of whether the Montana Supreme Court's decision of Doyle's speedy trial claim was unreasonable and whether the State violated Doyle's right to a speedy trial.  A certificate of appealability should be DENIED on Claims 2-4.

3. When Claims 1-5 have been disposed of, the Clerk of Court should be directed to enter judgment by separate document in favor of Respondents and against Petitioner.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Findings and Recommendations within fourteen (14) calendar days of the date entered as indicated on the Notice of Electronic Filing.  A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 43

Doyle must immediately inform the Court of any change in his mailing address. Failure to do so may result in dismissal of this action without notice to him.

DATED this 5th day of February, 2010.


/s/ Carolyn S. Ostby
Carolyn S. Ostby
United States Magistrate Judge

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE
(CLAIMS 1-4) / PAGE 44